United States District Court
Southern District of Texas
**ENTERED**
June 09, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BUSHIDOPRO, C.A., § § Plaintiff, § VS. § NIPPON PILLAR CORPORATION OF § AMERICA, INC, § § Defendant. § | CIVIL ACTION NO. 4:19-CV-4249 |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

After considering the evidence presented at trial, the arguments of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law. The following recitation of facts should be considered as findings of fact and the recitation of the application of the law to the facts as conclusions of law.

### I. Introduction

Bushidopro, C.A. ("Bushidopro") is a Venezuelan company that services the oil and gas industry in Venezuela. Its chief executive officer is Eduardo Luna and its technical director is Armando Marrero. Nippon Pillar Corporation of America, Inc. ("NPCA") is an American company that is the subsidiary of a Japanese company, Nippon Pillar Packing Company, Ltd., ("NPPC") which develops, manufactures, and supplies industrial equipment, including mechanical seals and gaskets for use in various industries. The chief operating officer of NPCA is Eiji Okumachi. Under various legal theories, Bushidopro claimed that NPCA owed it commission payments on five sales transactions that Bushidopro claimed it procured for NPCA.

As to one of the sales transactions, NPCA interpleaded Total Cranes Equipment & Parts Corp. ("Total Cranes"), claiming that NPCA was not obligated to pay Bushidopro because Total

Cranes had not yet paid NPCA. Total Cranes appeared and answered the third-party complaint, but its counsel subsequently withdrew. Total Cranes did not participate in the bench trial and NPCA filed a motion for summary judgment on its claims against Total Cranes (Doc. No. 66). Total Cranes, at its request, was given extra time to respond to the summary judgment motion and thereafter retained new counsel who filed a response in opposition to the summary judgment motion (Doc. No. 83). That motion remains pending.

## II. Applicable Law

1. In Texas, the essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Smith Intern., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

2. The central question to whether a contract existed is always whether the parties intended to be bound. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). If the parties intend to be bound, their intention to sign a more formal document is not a condition precedent to enforcement. *See Foreca, S.A. v. GRD Dev. Co., Inc.*, 758 S.W.2d 744, 746 (Tex. 1988).

3. Generally, "a contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). In construing a contract, vague, indefinite and uncertain agreements which do not identify the promises and required performances of those involved are not enforceable. *Carpenter Properties, Inc. v. JP Morgan Chase Bank Nat. Ass'n*, 647 Fed. Appx. 444, 451 (5th Cir. 2016). "Where the evidence shows that the parties intended to enter into an agreement, the courts should find the contract to be definite

enough to grant a remedy provided that there is a certain basis for determining the remedy." *Malone v. Ariba, Inc.*, 99 Fed. Appx. 545, 551 (5th Cir. 2004).

4. The "procuring cause" doctrine applies when a contract is silent or ambiguous as to when commissions are earned, but the plaintiff helped procure sales for the defendant. *Shanklin v. Columbia Mgmt. Advisors, L.L.C.*, CIV.A. H-07-2690, 2008 WL 4899631, at *16 (S.D. Tex. 2008).

5. To recover under the doctrine of quantum meruit, a plaintiff must establish that: (1) valuable services and/or materials were furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

6. Recovery should be allowed under quantum meruit when non-payment for the services rendered would result in an unjust enrichment to the party benefited by the work. The measure of damages in quantum meruit is the reasonable value of the work performed. *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550 (5th Cir. 2010).

### III. Findings of Fact and Conclusions of Law

1. In May 2016, NPCA appointed Bushidopro as its sales agent in Venezuela. This appointment was renewed a few times, with a termination date of November 30, 2018. None of these agreements gave Bushidopro the exclusive right to represent NPCA in Venezuela, nor did they give NPCA a right to condition payment on receipt of purchase orders by November 30, 2018.

2. The appointment constituted an agreement that NPCA would pay Bushidopro commissions on sales Bushidopro procured for NPCA. Bushidopro was owned equally by Luna, Marrero, and Marrero's sister, Deanna Marrero.

3. The parties did not execute written terms for the amount of commissions or when commissions would vest, and commissions were negotiated on an ad hoc basis after the sales were substantially completed. The commission amounts paid generally ranged from 30% to 50% of the entire sales price. That amount would be added to the final price that NPCA would have otherwise charged the customer. For example, if the initial sales price was $100,000, the commission would be somewhere between $30,000 and $50,000. The customer would subsequently receive an invoice for between $130,000 and $150,000.

4. In early 2017, Bushidopro, acting as NPCA's sales agent, made a sales call on Petropiar, a joint venture between PDVSA, a Venezuelan state-owned company, and Chevron Global Technology Services Company ("Chevron"). Bushidopro negotiated a deal under which NPCA's seals would be installed in the pumps of one of Petropiar's pump units at NPCA's expense, and if the seals performed perfectly for a four-month trial period, Petropiar would issue a purchase order and buy the mechanical seals and accompanying equipment for use with its applicable pumps at its facility (hereinafter referred to as the "Product Trial").

5. In May of 2017, to help facilitate the Product Trial, Bushidopro agreed with NPCA that Bushidopro would contribute $30,000 to the cost of the Product Trial.

6. On June 8, 2018, the Product Trial officially began. Marrero and various Bushidopro specialists in their capacities as Bushidopro employees installed the pumps and monitored the Product Trial for NPCA. They were present on a weekly and sometimes daily basis. Their role in this regard was critical for the Product Trial and the ultimate sale.

7. On or about July 31, 2018, NPCA informed Bushidopro that Petropiar was pleased with the performance of the seals up to that point, and had therefore agreed to reduce the Product Trial duration from four months to 90 days.

8. In late August of 2018, Marrero, who was unhappy with his venture with Luna, and Okumachi met in Houston. Marrero informed Okumachi that he and all five of Bushidopro's sales and technical specialists were planning to resign and that Marrero intended to form a new competing entity of his own, Bushido-Ve. Marrero did not have the authority to contract for Bushidopro and Okumachi knew that Marrero did not have the authority to contract for Bushidopro. At that time, neither Marrero nor any of the specialists had communicated this intention to Luna.

9. On September 6, 2018, the Product Trial ended. It was a success. Despite this success, all parties knew that it would take months for the Product Trial to result in a sale because the Petropiar product approval process was tedious and lengthy.

10. Due to what he learned in his meeting with Marrero, Okumachi was concerned about the continued viability of Bushidopro as NPCA's agent in Venezuela. On September 10, 2018, Okumachi flew to Venezuela to meet with Luna. Okumachi told Luna what Marrero had told him about Bushidopro, and Luna denied the allegations.

11. The next day, Okumachi met with Marrero and Bushidopro's five specialists, who confirmed that they intended to resign from Bushidopro and follow Marrero to his new company, Bushido-Ve.

12. On or about September 15, 2018, the specialists submitted their resignations to Luna. The agreement between Bushidopro and NPCA was silent on the issue of specialists and there is no evidence that Luna could not have timely replaced the resigning individuals.

Accordingly, these resignations did not constitute a "material breach" of the sales agency agreement between NPCA and Bushidopro.

13. Okumachi then sent Luna a series of WhatsApp messages inquiring about the status of Bushidopro and whether the specialists had resigned. Luna did not respond to these messages.

14. On September 17, 2018, NPCA appointed Marrero's new company, Bushido-Ve, as its sales agent in Venezuela. The NPCA agency agreement with Bushidopro was not exclusive, so this action was not a breach of that agreement.

15. On October 3, 2018, Luna emailed NPCA asking for banking information so that Bushidopro could pay the $30,000 it had agreed to contribute to the cost of the Product Trial. This message went unanswered.

16. On November 30, 2018, NPCA delivered to Bushidopro a formal termination letter of their Representative Agreement. The termination letter purported to inform Bushidopro that NPCA would not pay Bushidopro a commission on any Purchase Order that NPCA received after that date. This constituted an attempted unilateral modification to their agreement, and therefore was ineffective as it was not agreed to nor supported by consideration. If Bushidopro had already earned a commission prior to November 30, 2018 that had not yet been invoiced, the termination letter did not change Bushidopro's entitlement to be paid.

17. On October 10, 2018, Petropiar issued an initial Request for Quotation to NPCA for mechanical seals and accompanying equipment. This was the initial step in the lengthy purchase process mentioned above. (Subsequently, Chevron, one of the co-venturers of

Petropiar, replaced Petropiar as the buyer.) NPCA quoted a price of $2,107,760, which included a sales commission of $783,372.00 to NPCA's sales agent.

18. On January 11, 2019, Chevron, standing in Petropiar's shoes, issued a Request for Quotation to NPCA for two orders of 20 mechanical seals, 16 repair kits, and accompanying pressure units. NPCA sent its quote in response on February 5, 2019. Again, the quoted purchase price was $2,107,760.

19. Luna had earlier warned NPCA that it should not deal on credit terms with Petropiar and assured NPCA that he, through Bushidopro, could obtain a cash deal. Nevertheless, Marrero learned and then informed NPCA that Chevron would not provide any cash in advance to secure the purchase, but would instead pay 10 days after delivery of the product. Due to Luna's earlier warnings, NPCA did not want the "credit 10 days" term that Chevron had quoted.

20. It is unclear whether or not Luna (Bushidopro) could have obtained a cash deal from Chevron as was represented earlier. Bushidopro was never given the chance to try to do so. In order to remedy this problem, Bushido-Ve arranged for a third party, Bix Oil, to pledge NPCA $500,000 as security for the payment promised by Chevron in exchange for a commission from NPCA. Bix was to be compensated $200,000 for this arrangement.

21. Chevron submitted Purchase Order 70491 in March or April 2019 and paid NPCA $2,107,760. NPCA delivered the products to Chevron in July 2019. NPCA subsequently paid sales commissions on Purchase Order 70491 in the amounts of $683,372.00 to Bushido-Ve and $200,000 to Bix Oil. The originally agreed commission to Bushido-Ve was $783,372.00, but NPCA deducted $100,000 as Bushido-Ve's half of the money that was needed to compensate Bix Oil for the guaranty described above.

22. Chevron submitted Purchase Order 71779 to NPCA for two oil pressure units on November 25, 2019 also as a result of the Product Trial. Chevron paid for this product in February 2020 and NPCA paid Bushido-Ve a sales commission of $120,000.

23. No payment was made to Bushidopro on either of these sales despite the efforts (including its performance in the key Product Trial) it had put in for months.

24. Bushidopro had procured the Product Trial deal, its employees installed the equipment and monitored and insured the successful trial at Petropiar. Bushidopro was clearly entitled to a sales commission from NPCA on Purchase Orders 70491 and 71779. Nevertheless, the agreement between the parties was not definite enough to enforce. There is no evidence (other than what NPCA actually paid to Bushido-Ve) showing what commission amount the parties intended that Bushidopro would receive for its services connected to the Product Trial. There is no "certain basis for determining the remedy" here. *Malone*, 99 Fed. Appx at 550. Accordingly, Bushidopro's claim for breach of contract fails.

25. Nevertheless, Bushidopro provided valuable services and labor to NPCA by which NPCA reaped a substantial benefit. NPCA accepted these benefits and knew that Bushidopro expected to be paid for its services. The fact that NPCA unilaterally chose to ignore these facts and voluntarily chose to pay someone else the commission is of no consequence.

26. For the same reasons that its breach of contract claim fails, the amount Bushidopro claims it is owed is not pursuant to an agreement that expressly provides the amount. Accordingly, its claim for sworn account fail.

27. Likewise, there is no evidence to show that NPCA promised a specific amount of commission for the sales at issue. Accordingly, Bushidopro's claim for promissory estoppel fails.

28. Bushidopro has satisfied the elements of quantum meruit. Bushidopro furnished the valuable service to NPCA of procuring, negotiating, and overseeing the Product Trial. NPCA accepted these services by contracting with Petropiar and Chevron. NPCA was notified that Bushidopro expected to be paid for these services because NPCA knew that Bushidopro played a paramount role in procuring the deal with Petropiar on NPCA's behalf and expected to be compensated as NPCA's agent. Bushidopro has proved its quantum meruit claim by a preponderance of the evidence as to Purchase Orders 70491 and 71779.

29. Bushidopro performed valuable services for NPCA related to the Product Trial, but Bushido-Ve also provided services in order to finalize the payment from Chevron. Accordingly, the reasonable value of the services Bushidopro performed for NPCA is less than the total amount of commission that Bushido-Ve was paid.

30. The reasonable value of services Bushidopro performed for NPCA related to Purchase Order 70491 is $444,191.80.

31. The reasonable value of services Bushidopro performed for NPCA related to Purchase Order 71779 is $78,000.

32. Bushidopro did not provide sufficient evidence that it is entitled to payment on Purchase Orders 70069 or 261. Therefore, all claims with regard to these sales are denied.

33. NPCA has conceded that Bushidopro is owed a commission in an amount of $442,007 on Purchase Order 442 (a sale to Total Cranes totaling $1,050,687.04). If NPCA is actually paid for that Purchase Order by Total Cranes. The commission will be due to Bushidopro if and when Total Cranes pays Bushidopro for the sale, which is consistent with the prior ad hoc course of dealing between Bushidopro and NPCA.

34. NPCA's affirmative defenses to Bushidopro's quantum meruit claim have no merit.

35. Under Texas law, the prevailing party in a quantum meruit claim is entitled to attorney's fees. *See* Tex. Civ. Prac. & Rem. Code § 38.001(1)–(3) (authorizing attorney's fees for claims of "rendered services," "performed labor," and "furnished material"); *see also Cordova v. Sw. Bell Yellow Pages, Inc.*, 148 S.W.3d 441, 446 (Tex. App.—El Paso 2004, no pet.) ("[Texas law] also allows for the recovery of fees in a suit for quantum meruit."); § 3. Remedies, O'Connor's Texas Causes of Action Ch. 5-C § 3 (2021 ed.) ("In an action for quantum meruit, the plaintiff can recover reasonable attorney fees.").

36. The Court will take up the issue of the reasonable amount of attorney's fees before it enters a final judgment.

37. NPCA shall pay $522,191.80 in unpaid commissions to Bushidopro upon entry of a final judgment. It will also pay the agreed upon commission for the Total Cranes sale if and when Total Cranes pays NPCA. It shall pay costs in reasonable attorney's fees, expenses, and costs in an amount to be determined by the Court. Bushidopro shall file its attorney's fees and costs request by June 22, 2021. NPCA may file a response any time before July 3, 2021. Bushidopro may file a reply if it does so by July 12, 2021.

Signed at Houston, Texas, this _9th_ day of June, 2021.

Andrew S. Hanen
United States District Judge